## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MIGUEL TAMAYO, | ) | CASE NO. 8:11CV61 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM |
| CGS TIRES US, INC., DJR HOLDING | ) | AND ORDER |
| CORPORATION, and HI-LINE | ) | |
| COOPERATIVE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Joint Motion for Summary Judgment filed by Defendant CGS Tires US, Inc. ("CGS Tires") and Defendant DJR Holding Corporation ("DJR"). (Filing No. 48). The Court has considered the parties' briefs (Filing No. 49, 64, 70, 72) and evidence (Filing No. 50, 65 ) submitted in support of their respective positions. For the reasons discussed below, the Motion will be granted in part, and denied in part.

### FACTUAL BACKGROUND

Unless noted otherwise, the following facts are those that are stated in the briefs and supported by pinpoint citations to evidence in the record, that the parties have admitted, or that the parties have not properly resisted as required by NECivR 56.1 and Federal Rule of Civil Procedure 56.

The Continental 460/85 R 38 ("Continental") tire is a type of tractor tire. It was designed and released in 1999, and uses a spliced wire bead construction instead of a continuous wire bead construction. The purpose of wire beads in tires is to secure the tire to a wheel's rim and to provide strength to the tire so that it can handle the stress imposed upon it by the load it carries, inflation pressure, and service conditions. A spliced bead construction involves the splicing together of several separate strands of wire. In contrast,

a continuous bead design involves only one continuous strand of wire.  The structural integrity of tires with continuous beads is greater than the structural integrity of tires with spliced beads.  (Filing No. 65, Aff. of Joseph D. Walter, at CM/ECF p. 103, ¶ 9.)  Tires with a continuous bead construction are safer and less likely to explode than tires with a spliced bead construction.  (*Id.* at CM/ECF p. 104, ¶ 14.)

CGS Tyres of the Czech Republic n/k/a MITAS a.s. ("Mitas a.s.") manufactures tires including Continental tires.  It is the parent corporation of CGS Tires.  CGS Tires operates as the North American retailer for the tires that Mitas a.s. manufactures.  CGS Tires markets, sells, and distributes tractor tires, including Continental tires, in Nebraska.  It does not manufacture, design, or test Continental tires.[1]

DJR does business in Nebraska under the name of Schiebout Tire Company ("Shiebout").  It sells and supplies tires to various companies, including Defendant Hi-Line Cooperative, Inc. ("Hi-Line").[2]  One type of product DJR sells is tractor tires, including Continental tires.  DJR was a customer of and purchased merchandise, including

---

[1]Tamayo asserts that CGS Tires is not involved with the testing of Continental Tires because CGS Tires' "parent corporation has involvement in the testing of tractor tires." (Filing No. 64, Pl.'s Br. at CM/ECF p. 2, ¶ 6.)  Tamayo has not pointed to any evidence indicating Mitas a.s. tests tractor tires generally, or that it tested the tire at issue in this case.  Because Tamayo is the party asserting Mitas a.s. tests tractor tires and, as it relates to negligence claims relating to defective products, "supplier[s] ha[ve] a right to rely upon the inspection and tests performed by the manufacturer," *Erickson v. Monarch Indus., Inc.*, 347 N.W.2d 99, 108 (Neb. 1984) (citations omitted), the Court will assume for purposes of this Motion that Mitas a.s. tests the tractor tires it produces, including the tire at issue in this case.

[2]CGS Tires and DJR contend that DJR does not market Continental tires.  (Filing No. 49, Defs.' Br. at CM/ECF p. 4, ¶ 17.)  They point to the affidavit of Steve Roozeboom, DJR's current vice president of finance.  (Filing No. 50-9, at ¶¶ 5, 11.)  Tamayo contends that DJR markets Continental tires, and points to paragraphs eighteen and twenty-one in DJR's Answer to Tamayo's Complaint in support of his contention.  (Filing No. 14.)  However, DJR did not admit that it marketed Continental tires in those paragraphs, and Tamayo has not pointed to any other evidence to support its contention that DJR provided marketing for Continental tires.  Although the distinction between DJR selling Continental tires and DJR marketing Continental tires is slightly unclear, whether DJR provided marketing for Continental tires does not affect this Court's analysis.

Continental tires, from CGS Tires.  DJR has had no role or involvement in the manufacture or design of Continental tires.  DJR also has had no role or involvement in the testing of Continental tires, or in testing tires in general.  DJR has not provided any written or express warranties with regard to any Continental tires.

Plaintiff Miguel Tamayo became involved with tires at an early age.  He is now about forty-five years old, and he started to build tires at the age of seventeen or eighteen years. He has had experiences with the entire process of building tires, including constructing tires with wire beads.  When building tires, he would use a continuous bead construction.  He has attended numerous trade shows and tire conventions to learn about various types of tires, and his experience with tires has included working with various types and sizes of tires.  Prior to August 3, 2007, Tamayo had installed Continental tires about thirty times, and he has never experienced any problems when doing so.  He does not remember if he has ever read the instructions on how to mount or demount a Continental Tire.  (Filing No. 50-4, at CM/ECF p. 24, 60:3-6.)  He has read the warning displayed on the side of Continental tires numerous times.  The warning states:

> SAFETY WARNING,      SERIOUS INJURY MAY RESULT FROM:
> * EXPLOSION OF TIRE/RIM ASSEMBLY DUE TO IMPROPER MOUNTING — USE SAFETY CAGE OR SEPARATE ROOM AND CLIP-ON EXTENSION AIR HOSE.  ONLY SPECIALLY TRAINED PERSONS SHOULD MOUNT TIRES. NEVER EXCEED 35 PSI WHEN SEATING BEADS.

(Filing No. 50-6.)

Sometime around August of 2007, Tamayo worked as a tire technician for Hi-Line. As a tire technician, his duties included changing various tires, including agricultural, consumer, and commercial tires.  On August 3, 2007, Lynn Frederick, a farmer, called Tamayo and indicated that he needed a new tire put on his tractor.  Tamayo informed

3

Frederick of the tires he could choose from. Frederick asked Tamayo to install a Continental tire and to bring a "tube and calcium" to add weight to the tire in order to reduce the tractor's risk of "spinning out." Tamayo was not concerned about using a Continental tire.

Tamayo went to Hi-Line to find a Continental tire. He selected one and inspected it for flaws. He was comfortable with the Continental tire he selected (the "Tire"). Following his inspection, he loaded the Tire onto his truck and proceeded to Frederick's farm. CGS Tires sold the Tire to DJR on or about January 5, 2007. (Filing No. 50-9, at ¶ 12; Filing No. 65, at CM/ECF p. 22-23.)[3] DJR delivered the Tire to Hi-Line on or about January 8, 2007. (Filing No. 50-9, at ¶ 12; Filing No. 65, at CM/ECF p. 18.)

After arriving at Frederick's farm, Tamayo used a jack to raise Frederick's tractor and removed the old tire. Prior to installing the Tire, Tamayo inspected it again to make sure that no beading wires were sticking out of the rubber. He did not find any problems with the Tire during his inspection. Tamayo then proceeded to install the Tire. He seated the Tire's beads, put calcium in the Tire, and inflated the Tire to the proper air pressure. He does not remember whether he read the warnings on the Tire on August 3, 2007, or whether he read the mounting or demounting instructions for the Tire. He was comfortable with his inspection and installation of the Tire. He did everything properly when installing the Tire. After Tamayo installed the Tire, he lowered the axle of the tractor off of the jack.

---

[3]CGS Tires and DJR contend that there is no verifiable proof that the Tire went through CGS Tires. (Filing No. 49, at CM/ECF p. 5 n.3.) Tamayo, however, has pointed to evidence indicating that CGS Tires sold *the* Tire to DJR. CGS Tires asserts that the evidence Tamayo has pointed to only tends to show that it shipped DJR *a* Continental tire, not that CGS Tires shipped DJR *the* Tire. (Filing No. 72, Def.'s Br. at CM/ECF p. 6, ¶ 20.) Nevertheless, CGS Tires admits, for purposes of the present Motion only, that it sold *the* Tire to DJR. (Filing No. 49, at CM/ECF p. 5 n.3.).

4

When Tamayo released the jack, the Tire exploded and Tamayo sustained injuries. Prior to August 3, 2007, Tamayo had never been involved in a tire-related incident.

After the Tire exploded, Tamayo drove back to Hi-Line to get another Continental tire so that he could install it on Frederick's tractor. Before he began installing the new Continental tire, he inspected the Tire. Tamayo concluded that the wire bead in the Tire broke and failed to hold the Tire together on the rim of Frederick's tractor. When installing the new Continental tire, Tamayo went through the same procedure as he did when he installed the Tire. When he let the new Continental tire off of the jack, it did not explode. Frederick was able to use his tractor, and has not had any problems with the rim or new Continental tire. Two days later, a representative of DJR received notice that the Tire exploded. (Filing No. 65, Aff. of Roy Evans, at CM/ECF p. 100, ¶ 7.) CGS Tires and its representatives also received notice of the explosion sometime in August of 2007. (*Id.* at ¶¶ 10-11.)

Sometime in March of 2009, Tamayo retained Joseph D. Walter as an expert in the field of tire failures. (Filing No. 65, at CM/ECF p. 102, ¶¶ 3-4.) On April 15, 2009, Joseph D. Walter personally inspected and examined the Tire. (*Id.* at ¶ 5.) He confirmed that the tire had a spliced bead construction, and concluded that the Tire exploded because of its spliced bead construction. (*Id.* at CM/ECF p. 103, ¶ 7.) He believed that it was "readily apparent and would be obvious to any person (lay person or expert) who would inspect and examine the [Tire] that the wire bead failed, the wire bead on the inside of the [T]ire

separated and broke.  The failure of this inside bead resulted in the [T]ire explosion." (*Id.* at CM/ECF p. 104, ¶ 13.)[4]

On January 7, 2011, Tamayo filed a Complaint in the District Court of Lancaster County, Nebraska  (Filing No. 1-1), alleging CGS Tires and DJR are liable to him for his damages caused by their negligence, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for particular purpose.  Tamayo also alleged that CGS Tires is liable to him based on a theory of strict liability.  On February 17, 2011, CGS Tires and DJR filed a Notice of Removal.  (Filing No. 1.)  On December 15, 2011, the Court dismissed Tamayo's strict liability claim.  On April 23, 2012, CGS Tires and DJR filed the present Motion, seeking the dismissal of Tamayo's three remaining claims.

## STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.,* 655 F.3d 811, 819 (8th Cir. 2011).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings

---

[4]CGS Tires notes that the parties have not had the opportunity to depose Joseph D. Walter or refute his contentions, because Tamayo only recently disclosed him as an expert. (*See* Filing No. 69; Filing No. 72, at CM/ECF p. 19.) CGS Tires states that it lacks knowledge as to the truth of Joseph D. Walter's affidavit, but that it does not dispute it for purposes of the present Motion.  DJR has not addressed Joseph D. Walter's affidavit.

themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), *cert. denied,* 130 S. Ct. 1074 (2010). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita,* 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)). "In ruling on a motion for summary judgment, the district court is not obligated to wade through and search the entire record for some specific facts which might support" a party's claim. *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (quotations omitted).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to

those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I. Negligence Claim

Under Nebraska law, "[o]rdinary negligence is defined as the doing of something that a reasonably careful person would not do under similar circumstances, or the failing to do something that a reasonably careful person would do under similar circumstances." *Wilke v. Woodhouse Ford, Inc.*, 774 N.W.2d 370, 379 (Neb. 2009) (citing *Caguioa v. Fellman*, 747 N.W.2d 623 (Neb. 2008); *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478 (Neb. 1998)).  "[N]egligence is never presumed, and the mere happening of an accident does not prove negligence as a matter of law." *Stones v. Sears, Roebuck & Co.*, 558 N.W.2d 540, 546 (Neb. 1997) (citing *Scholl v. Cnty. of Boone*, 549 N.W.2d 144 (1996)).  Instead, "a negligence claim focuses on the seller's conduct," *Wilke*, 774 N.W.2d at 379 (citing *Freeman v. Hoffman-La Roche, Inc.*, 260 Neb. 552, 618 N.W.2d 827 (2000)), and "'must be proved by direct evidence or by facts from which such negligence can be reasonably inferred.'" *Porter v. Black*, 289 N.W.2d 760, 764 (Neb. 1980) (quoting *Price v. King*, 72 N.W.2d 603, 604 (Neb. 1955)).

"In order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty." *Wilke*, 774 N.W.2d at 379 (citing *Bargmann*, 574 N.W.2d 478 (Neb. 1998)).  "'The burden of proving negligence

8

is on the party alleging it.'"  *Porter*, 289 N.W.2d at 764 (quoting *Fincham v. Mueller*, 89 N.W.2d 137 (Neb. 1958)).

While "[t]he existence of a duty and the identification of the applicable standard of care are questions of law, . . . the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact." *Wilke*, 774 N.W.2d at 380 (citing *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 628 N.W.2d 697 (2001)).  "A duty is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."  *Munstermann ex rel. Rowe v. Alegent Health-Immanuel Med. Ctr.*, 716 N.W.2d 73, 83 (Neb. 2006).[5]

Nebraska has adopted the definition of negligent failure to warn found in the Restatement (Second) of Torts § 388 (1965).  *See Erickson v. U-Haul Int'l, Inc.*, 738 N.W.2d 453, 460 (Neb. 2007) (citing Restatement (Second) of Torts § 388 (1965)). Section 388 of the Restate (Second) of Torts states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

---

[5]When determining whether a legal duty exists, Nebraska courts consider: "(1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution."  *Id.* at 83-84.

Restatement (Second) of Torts § 388 (1965).  When interpreting Nebraska law, the Eighth Circuit has stated that "[s]ubsection (b) of this test has been interpreted to mean that there is no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." *Strong v. E. I. DuPont de Nemours Co., Inc.*, 667 F.2d 682, 687 (8th Cir. 1981) (citing *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464-65 (5th Cir. 1976); *Madrid v. Mine Safety Appliance Co.*, 486 F.2d 856, 860 (10th Cir. 1973); *Lockett v. Gen. Elec. Co.*, 376 F. Supp. 1201, 1208-09 (E.D. Pa.1974), aff'd, 511 F.2d 1394 (3d Cir. 1975); *Bryant v. Hercules, Inc.*, 325 F. Supp. 241, 247 (W.D. Ky.1970)); *see also Erickson v. Monarch Indus., Inc.*, 347 N.W.2d 99, 109 (Neb. 1984) ("In light of the fact that . . . the supplier knew that those to whom it[s] [products] would be sold would have special knowledge as to how to install the [product], we conclude that the supplier had no additional duty to warn.").

A supplier of a product does not have a duty to inspect the product unless it has good cause to believe that an inspection should be made.  *See Darnell v. Panhandle Co-op Ass'n*, 120 N.W.2d 278, 283-284 (Neb. 1963);[6] *see also* Restatement (Second) of Torts

---

[6]

A propane supplier has no duty to inspect service pipes owned and controlled by others on private property unless it has knowledge of a probable defective condition in the pipes or has knowledge of circumstances rendering it probable that gas is escaping therefrom. Where the supplier has good cause to believe that an inspection should be made of the propane system of one of its customers, the failure to make an inspection of the system may be negligence.

*Id.* (citing *Clay v. Butane Gas Corp.*, 39 N.W.2d 813, 821 (Neb. 1949)).

§ 402 (1965).[7]  Furthermore, "[a] supplier has a right to rely upon the inspection and tests performed by the manufacturer."  *Monarch Indus.*, 347 N.W.2d at 108 (citations omitted).

CGS Tires and DJR assert four arguments in support of dismissing Tamayo's negligence claim.  First, they assert that, to the extent Tamayo's claim rests on the allegation that CGS Tires and/or DJR manufactured or designed a tire that was defective, the uncontroverted facts in the record indicate that neither CGS Tires nor DJR had any involvement in the design or manufacture of the Tire, or Continental tires in general.  Second, they assert that, as non-manufacturing sellers of the Tire, they had no duty to warn Tamayo, a person with skill and extensive experience working with tires, and who had actual knowledge of the potential dangers associated with installing tires.  Third, they assert that, as non-manufacturing sellers of the Tire, they had no duty to inspect and/or test the Tire for latent defects.  Finally, CGS Tires and DJR argue that Tamayo has failed to point to any evidence tending to show his injuries were caused by something more than a mere accident.

Tamayo has failed to point to evidence in the record tending to show that CGS Tires or DJR engaged in a negligent act or omission that proximately caused his injuries.  With regard to Tamayo's allegegation that CGS Tires and/or DJR failed to warn him that the Tire could explode, Tamayo admits that, through his professional experiences in building and installing tires, he obtained knowledge of the risks associated with installing tires.  As a

---

[7]

A seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it.

*Id.*

11

result, no reasonable finder of fact could conclude that Tamayo did not know or should not have known that the Tire might explode when he was installing it on Frederick's tractor. Therefore, Neither CGS Tires nor DJR had a duty to warn Tamayo that the Tire might explode.   Nonetheless, a warning on the Tire stated that it could explode during the installation process.  Although he may not have read the warning on August 3, 2007, he admitted that he was aware of the warning on Continental tires, and that had previously read the warning numerous times.  Accordingly, the Court finds, to the extent that CGS Tires and/or DJR had a duty to warn Tamayo that the Tire could explode, they had no additional duty, beyond the warning that was provided on the Tire, to warn Tamayo that the Tire could explode.[8]

With regard to Tamayo's allegation that CGS Tires and/or DJR were negligent because they failed to inspect the Tire, the uncontroverted evidence in the record indicates that neither CGS Tires nor DJR manufactured or designed the Tire.  The uncontroverted evidence also indicates that Tamayo, an individual with significant knowledge of and experience with tires, did not uncover a defect despite conducting two inspections prior to attempting to install the tire.  Nothing in the record suggests an inspection by CGS Tires or DJR would have turned out any differently.  Furthermore, Tamayo has asserted that

---

[8]Tamayo alleged in his Complaint that CGS Tires and DJR were negligent because they failed to provide proper instructions.  (Filing No. 1-1, ¶ 16.g.)  He did not allege that they did not provide any instructions, and has not re-asserted in his opposition brief that CGS Tires or DJR failed to provide proper instructions.  Furthermore, Tamayo has not pointed to any instructions in the record, and Tamayo bears the burden of proving CGS Tires's and DJR's negligence.  *See Porter*, 289 N.W.2d at 764 (quoting *Fincham*, 89 N.W.2d 137).  Even if the instructions were improper, Tamayo admits that he does not remember ever having read them.  (Filing No. 50-4, at CM/ECF p. 24, 60:3-6.)  *See Monarch Indus.*, 347 N.W.2d at 109 (citing *Hughes v. Magic Chef, Inc.*, 288 N.W.2d 542 (Iowa 1980); *Procter & Gamble Mfg. Co. v. Langley*, 422 S.W.2d 773 (Tex. Civ. App.1967)) ("It is not reasonably foreseeable that a consumer of particular expertise would fail to follow directions. . . . Failure to follow plain and unambiguous instructions is a misuse of the product.").  Therefore, to the extent Tamayo has not abandoned his claim for negligent failure to provide proper instructions, the Court finds that Tamayo has failed to point to sufficient evidence to support his claim.

Mitas a.s. tests the tires it manufactures.  Assuming Mitas a.s. tested the Tire, "[CGS Tires and DJR] ha[d] [the] right to rely upon the inspection and tests performed by [Mitas a.s.]." *See Monarch Indus.*, 886, 347 N.W.2d at 108 (citations omitted).  Therefore, nothing in the record leads the Court to believe that CGS Tires or DJR "ha[d] good cause to believe that an inspection should be made," and thus, neither CGS Tires nor DJR had a duty to inspect the Tire.  *See Darnell*, 120 N.W.2d at 283-284.

To the extent Tamayo's negligence claim is based on the negligent design or manufacture of the Tire, the uncontroverted evidence in the record indicates that neither CGS Tires nor DJR was involved with the design or manufacture of the Tire.  Tamayo has pointed to evidence tending to show that Mitas a.s., CGS Tire's parent corporation, manufactures Continental tires.  Tamayo has not, however, directed the Court to any authority indicating a parent corporation's negligent manufacturing can be imputed to its retailer, and the Court has not found such authority.

The only evidence Tamayo has pointed to in support of his negligence claim is that the Tire exploded.  This evidence does not "focus[ ] on [CGS Tire's or DJR's] conduct," *see Wilke*, 774 N.W.2d at 379 (citing *Freeman v. Hoffman-La Roche, Inc.*, 260 Neb. 552, 618 N.W.2d 827 (2000)), and the fact that the Tire exploded is not enough to lead a reasonable finder of fact to conclude that CGS Tires or DJR were negligent.  *See Stones*, 558 N.W.2d at 546 ("The fact that the grill caught fire is not enough to warrant a finding of negligence, for negligence is never presumed, and the mere happening of an accident does not prove negligence as a matter of law.").  Therefore, CGS Tires and DJR's Motion will be granted as it relates to Tamayo's negligence claim.

13

## II.  Breach of the Implied Warranty of Merchantability Claim

"Unless excluded or modified (section 2-316) a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Neb. Rev. Stat. U.C.C. § 2-314(1).  To establish a claim for breach of the implied warranty of merchantability, the plaintiff bears the burden of proving: (1) that the defendant sold the product at issue; (2) that the defendant was a "merchant" with respect to products of that kind at the time of the sale; (3) that the product was not merchantable at the time it was delivered by the defendant; (4) that the plaintiff gave the defendant notice of the breach of the implied warranty within a reasonable time after the plaintiff discovered or should have discovered the breach; (5) that the breach or noncompliance with the implied warranty "was a proximate cause of some damage to the plaintiff"; and (6) the "nature and extent" of the plaintiff's damages.  *See* NJI2d Civ. 11.42 (2011 ed.).[9]  "In proving a deviation from the standard of merchantability, some proof of

---

[9]

Before the plaintiff can recover against the defendant[ on (his, her, its) claim of breach of implied warranty of merchantability], the plaintiff must prove, by the greater weight of the evidence, each and all of the following:

1 That the defendant sold the (here insert word(s) identifying the specific goods in question);

2 That, at the time of the sale, the defendant was a merchant with respect to (goods) of that kind;

3 That, at the time the (goods) were (delivered, turned over, tendered, et cetera) by the defendant, they were not merchantable;

4 That, within a reasonable time after the plaintiff discovered [or should have discovered] the breach, (he, she, it) gave the defendant notice of breach;

5 That the (breach of this warranty, noncompliance with this warranty, failure of the goods to perform as warranted) was a proximate cause of some damage to the plaintiff; and

6 The nature and extent of that damage.

NJI2d Civ. 11.42 (2011 ed.).

14

noncompliance with the warranty must be presented." *Delgado v. Inryco, Inc.*, 433 N.W.2d 179, 184 (Neb. 1988).  Section 2-314 states:

Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Neb. Rev. Stat. U.C.C. § 2-314(2).[10]

CGS Tires and DJR argue that Tamayo's claim for breach of the implied warranty of merchantability should be dismissed only because Tamayo has failed to point to

---

[10]*See also* NJI2d Ci. 11.43 (2011 ed.):

To be merchantable, (goods) must:

1 Be such as would pass without objection in the trade as (goods) of the kind described [or otherwise designated];

2 In the case of (fungible, interchangeable, generic) goods, be of fair average quality for (goods) of the kind described [or otherwise designated] in the contract;

3 Be fit for the ordinary purposes for which such (goods) are used;

4 Within the variations permitted by the agreement, be of even kind, quality, and quantity, within each unit and among all of the units involved;

5 Be adequately contained, packaged, and labeled as the agreement may require; and

6 Conform to the promises or affirmations of fact made on the container or the label, if any.

15

evidence sufficient to establish that the Tire was not merchantable.  They contend that Tamayo has merely pointed to evidence tending to show that an accident occurred and not that the Tire was unfit for ordinary purposes.  They do not contend that Tamayo has failed to establish any of the other five elements of his claim.[11]  They point to the Nebraska Supreme Court's decision in *Delgado* to support their argument that Tamayo merely has pointed to evidence sufficient to show an accident occurred and, therefore, has failed to point to evidence sufficient to establish that the Tire was unfit for ordinary purposes.

In *Delgado*, an ironworker sued a subcontractor for, among other things, breach of the implied warranty of merchantability.  *Delgado*, 433 N.W.2d at 181-82.  Part of the ironworker's job was to help install concrete floors.  The subcontractor supplied the equipment and materials needed to install those concrete floors.  *Id.* at 181.  "When the concrete floor was poured, steel cables . . . were imbedded in the concrete."  *Id.*  Those cables would be anchored on one side of the floor and extend to the other and had to maintain a certain degree of tension.  *Id.*  The ironworker would use special equipment to achieve the required tension in the cables.  *Id.*  Once the required tension was achieved, clips would be used at the free end of the cable to maintain the required tension.  The clips,

---

[11]In his opposition brief, after responding to CGS Tires and DJR's statement of material facts, Tamayo set forth "facts" which he believes to be material.  (Filing No. 64, at CM/ECF p. 5-13, ¶¶ 1-102.)  Those "facts" include: (1)  "CGS Tires is a 'Merchant' within the meaning of the implied warranty of merchantability," and (2) "DJR is a 'Merchant' as defined in the Uniform Commercial Code."  (*Id.* at ¶¶ 2, 17.)  DJR did not dispute those "facts" in its reply brief.  CGS Tires admitted that it sells tires, but asserted that "whether it is a 'merchant' as defined in the Uniform Commercial Code . . . is a legal question."  (Filing No. 72, at CM/ECF p. 5, ¶ 2.)  CGS Tires also admitted that DJR sells tires, but again asserted that "whether it is a 'merchant' as defined in the UCC is a legal question."  (*Id.* at ¶ 17.)

Nebraska's Uniform Commercial Code defines a "merchant" as "a person who deals in goods of the kind."  Neb. Rev. St. U.C.C. § 2-104.  It is undisputed that both CGS Tires and DJR are in the business of selling and distributing tires.  Thus, to the extent that the issue of whether CGS Tires and DJR has not been admitted, a reasonable finder of fact could conclude that CGS Tires and DJR "deal in" tractor tires and, therefore, are "merchants" under Nebraska's Uniform Commercial Code.

however, would sometimes slip.  If a clip slipped, the ironworker would need to remove the clip, re-stretch the cable, and then re-attach the clips.  *Id.* On one occasion, when the ironworker was attempting to detach a clip so he could re-stretch a cable, certain equipment the ironworker used to help stretch the cable slipped and amputated his left ring finger and left thumb.  *Id.* at 181-82.  The equipment had been used successfully prior to the incident on several occasions and was still working when it was tested after the incident.  *Id.* at 182.

In support his contention that the equipment at issue was defective and, therefore, not merchantable, the ironworker pointed only to the fact that the equipment slipped.  *Id.* at 183.  "No expert or engineer in the field of construction testified" with regard to that issue, the ironworker "presented no testimony as to the precise cause of the accident," and "[t]here was no testimony as to the . . . equipment's merchantability or quality at the time" the equipment was delivered to the ironworker's employer.  *Id.* at 183.  The ironworker also did not present any expert testimony relating specifically to the equipment that slipped, or relating generally to equipment of that type.  *Id.* at 183.  As a result, the court in *Delgado* found that the ironworker failed "to establish a standard of merchantability and prove that it was breached."  *Id.* at 184.

The court explained that there must be evidence indicating that the product "'sold failed to perform adequately because of a lack of quality inherent in the item itself,'" and that "[i]n proving a deviation from the standard of merchantability, some proof of noncompliance with the warranty [had to] be presented."  *Id.* at 183-84 (quoting *O'Keefe Elevator v. Second Ave. Props.*, 343 N.W.2d 54, 56-57 (Neb. 1984)).  The court found that

17

"[t]he plaintiff did not present any such evidence.  The plaintiff relied only on the fact that the accident occurred as proof that the . . . equipment was not merchantable," and noted that noted that "[t]he purpose of the . . . equipment was to stretch the steel cables. . . . The equipment worked on hundreds of occasions without incident," and "[a]fter the accident, the construction crew used the same equipment . . . [on] approximately 400 to 500 more cables."  *Id.* at 184.

Unlike the ironworker in *Delgado*, Tamayo has presented evidence indicating that the Tire "'failed to perform adequately because of a lack of quality inherent in the item itself.'"  *See id.* at 183-84 (quoting *O'Keefe*, 343 N.W.2d at 56-57).  Tamayo has not solely relied on the fact that the Tire exploded to show that the Tire was not merchantable.  Unlike the equipment in *Delgado* which had worked without incident numerous times both before and after the accident, the Tire never worked.  The Tire's purpose was to function as a tractor tire.  Despite the Tire being properly installed, it exploded and never functioned as a tractor tire.[12]  Furthermore, CGS Tires and DJR admit, at least for purposes of the present Motion, that Tamayo has significant experience and knowledge relating to building and installing tires, and Tamayo has stated that it was readily apparent when he inspected the Tire after the incident that the Tire exploded because the tire bead failed.  Tamayo has also pointed to an expert's opinion that indicated tires with a continuous-bead construction have a higher degree of structural integrity than tires with a spliced-bead construction, that

---

[12]The fact that a product can not be used safely even if used properly suggests that the product is unfit for ordinary purposes.  *See Steele v. Encore Mfg. Co., Inc.*, 579 N.W.2d 563, 569 (Neb. Ct. App. 1998) ("In the case before us, the evidence did not show that the air compressor was unfit for its ordinary purposes. The evidence did not show that the air compressor was incapable of being safely operated and serviced if the manufacturer's instructions were followed.").

18

the Tire had a spliced-bead construction, and that it was clear the explosion occurred because the Tire had a spliced-bead construction.

Based on this evidence, a reasonable finder of fact could conclude that the Tire was not "fit for the ordinary purpose[ ] for which [tractor tires] are used." *See* Neb. Rev. St. U.C.C. § 2-314(2). As a result, CGS Tires and DJR's Motion will be denied as it relates to Tamayo's claim for breach of the implied warranty of merchantability.

## III. Breach of Implied Warranty for a Particular Purpose Claim

CGS Tires and DJR assert that Tamayo's claim for breach of the implied warranty for a particular purpose should be dismissed because Tamayo has failed to point to evidence tending to show that the Tire would be used for anything other than its ordinary purpose: use as a tractor tire.

For a plaintiff to succeed on a claim for breach of the implied warranty of fitness for a particular purpose, the plaintiff must establish: "(1) the seller had reason to know of the buyer's particular purpose in buying the goods, (2) the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish appropriate goods, and (3) the buyer, in fact, relied upon the seller's skill or judgment." *Stones*, 558 N.W.2d at 547 (citing *Laird v. Scribner Coop*, 466 N.W.2d 798 (Neb. 1991)). "'A "particular purpose" differs from the ordinary purpose for which the goods are used.'" *Id.* (quoting Neb. Rev. Stat. § 2-315, cmt. 2). A "particular purpose" "'envisages a specific use by the buyer which is peculiar to the nature of his or her business.'" *Id.* (quoting Neb. Rev. Stat. § 2-315, cmt. 2). In contrast, an "ordinary purpose" is one "'envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.'" *Id.* (quoting Neb. Rev. Stat.

19

§ 2-315, cmt. 2).  In other words, liability for breach of the implied warranty of fitness for a particular purpose "lies only when goods do not fulfill the specific need for which they were purchased, and not when the goods . . . fail to meet their ordinary purpose."  *Id.* (citing Neb. Rev. Stat. § 2-315).[13]

Even assuming Tamayo is considered to have purchased the Tire, Tamayo does not contend, and has failed to point to any evidence in the record indicating, that the Tire was purchased for a "specific use" that is different from how tractor tires are customarily used.  Tamayo has asserted only that the Tire was purchased so that it could be mounted on and used as a tractor tire on Frederick's tractor.  This is a use which is "'customarily made of [tractor tires].'" *See id.* (quoting Neb. Rev. Stat. § 2-315, cmt. 2).  Therefore, CGS Tires and DJR's Motion will be granted as it relates to Tamayo's claim for breach of the implied warranty of fitness for a particular purpose.  *See id.* (citing *DiIenno v. Libbey Glass Div., Owens-Ill., Inc.*, 668 F. Supp. 373, 376 (D. Del.1987); *Royal Lincoln-Mercury Sales v. Wallace*, 415 So.2d 1024 (Miss. 1982) ("[W]e hold that summary judgment was appropriate because the warranty of implied fitness for a particular purpose does not apply when the goods in question are purchased and used for ordinary purposes.").

---

[13]The Court notes that although a "particular purpose" contemplates a "specific use . . . peculiar to the nature" of one's business, *see Stones*, 558 N.W.2d at 547 (quoting Neb. Rev. Stat. § 2-315, cmt. 2), the "specific use" does not have to be "abnormal."  *See Outlook Windows P'ship v. York Int'l Corp.*, 112 F. Supp. 2d 877, 899-900 (D. Neb. 2000) (citing *Mennonite Deaconess Home & Hosp. v. Gates Eng.*, 363 N.W.2d 155 (Neb. 1985); *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 261 N.W.2d 358 (1978); *Shotkoski v. Standard Chem. Mfg. Co.*, 237 N.W.2d 92 (Neb. 1975); *Larutan Corp. V. Magnolia Homes Mfg. Co. of Neb.*, 209 N.W.2d 177 (Neb. 1973)) (applying Nebraska law and stating that "it is not necessary that the buyer put the goods to an abnormal use" to succeed on a claim for breach of the implied warranty of fitness for a particular purpose.).

Accordingly,

IT IS ORDERED that the Joint Motion for Summary Judgment filed by Defendant CGS Tires, Inc., n/k/a Mitas Tires North America, Inc., and DJR Holding Corporation (Filing No. 48) is granted in part, as follows:

1.      Plaintiff Miguel Tamayo's negligence claim is dismissed, with prejudice;

2.      Plaintiff Miguel Tamayo's claim for breach of the implied warranty of fitness for a particular purpose is dismissed, with prejudice; and

3.      The Joint Motion is otherwise denied.

DATED this 12th day of June, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge